2007 UT 86

**Bob BISSLAND, Laura Fisher, Sharell Eames, Margaret Recker, Neil Larsen, Roger Dahle, Mary Ellen Klomps, Linda Goetse and Ralph Call, Petitioners and Appellants,**

v.

**Skarlet BANKHEAD, Providence City Recorder; Providence City, Respondents and Appellees.**

**Redstone Development, LLC, and Checketts Farm, LLC, Intervenors and Appellees.**

Nos. 20070780, 20070805.

Supreme Court of Utah.

Oct. 26, 2007.

---

D. Rand Henderson, Kenneth C. Allsop, Logan, for petitioners Bissland, Fisher, and Call.

Gary N. Anderson, Brian G. Cannell, Logan, for petitioners Eames, Recker, Larsen, Dahle, Goetse, and Klomps.

N. George Daines, Craig J. Carlston, Scott L. Wyatt, Logan, for respondents.

Kenneth D. Bradshaw, Ogden, Amy Hugie, Brigham City, for intervenors.

Brent M. Johnson, Salt Lake City, for Judge Willmore.

NEHRING, Justice:

¶ 1 Petitioners are residents of Providence City, Utah, who seek to overturn by referendum an annexation ordinance. The Providence City recorder refused to approve the proposed referendum for placement on the ballot for the November 2007 vote. The recorder determined that Petitioners failed to submit their petition within forty-five days of the ordinance's passage, as required by law. The district court agreed and granted summary judgment for Providence City. We affirm.

**BACKGROUND**

¶ 2 Members of the Providence City Council gathered on October 24, 2006, to consider an ordinance that would annex property into the municipal boundaries of Providence City. The ordinance included an annexation agreement that outlined the conditions of the property's development after annexation. The city council recognized, however, that the language describing these conditions was flawed. Although the agreement unequivocally provided that "[n]o development will occur ... until after the following three conditions have been fully satisfied," one of the conditions seemingly contradicted this mandate. At the meeting, the city attorney proposed the change in language necessary to cure the contradiction. The city council passed the ordinance despite the flaw, with the understanding that the city attorney would remedy the defect in the agreement. Several Petitioners attended the meeting where the ordinance was passed.

¶ 3 The ordinance appears to have taken no one by surprise. Not only did several Petitioners attend the critical meeting, but the evidence suggests that they planned to organize a referendum petition to submit the ordinance's fate to the Providence City voters even before the October 24 city council vote. Despite their efforts to plan ahead, Petitioners found themselves working against a tight deadline. The Utah Code mandates that "[s]ponsors of any referendum petition challenging ... any local law passed by a local legislative body shall file the petition within 45 days after the passage of the local law." Utah Code Ann. § 20A–7–601(3)(a) (Supp.2006). In this case, the statutory deadline was December 8, 2006.

¶ 4 Petitioners contend that they were unsure about how the need to modify the annexation agreement's language after the city council passed the ordinance affected their referendum plans and the December 8 deadline. They cite Utah law as the source of their uncertainty. By law, a referendum petition must include "one copy of the law" to be challenged. Id. § 20A–7–602(2)(d). Petitioners assert that they were unsure which copy of the ordinance to attach. Ultimately, Petitioners decided that their referendum petition would be best immunized from legal challenges if it were accompanied by a copy of the signed, executed ordinance in its final form, rather than a copy of the version passed. Consistent with this belief, Petitioners filed a request on October 27 under Utah's Government Records and Management Access Act (GRAMA) seeking a copy of "the executed annexation ordinance" and "the executed annexation agreement." Providence City responded to Petitioners' GRAMA request and posted a copy of the ordinance on November 16, one day after the ordinance and annexation agreement were signed and twenty-one days before the December 8 referendum petition filing deadline.

¶ 5 Even with a copy of the executed ordinance in hand, Petitioners' referendum efforts continued to experience delays. As a result, Petitioners did not submit the last packet of referendum petitions until January 2, 2007, nearly one month after the December 8 deadline and forty-seven days after receipt of the executed ordinance. In light of Petitioners' tardiness, the Providence City recorder, Skarlet Bankhead, refused to place the proposed referendum on the ballot.

¶ 6 Petitioners filed suit in Utah's First District Court against Ms. Bankhead and Providence City, the respondents in this

case. Petitioners based their suit on the claim that Ms. Bankhead erred in concluding that their petition was untimely. In Petitioners' view, the forty-five-day clock did not begin to tick until the ordinance was posted in its final form on November 16. The forty-five-day filing period, therefore, did not expire until January 2, the day on which they submitted the last of the petitions. To hold otherwise, Petitioners contended, would deprive them of due process of law. The district court disagreed with Petitioners, held their referendum petition to be untimely, and granted summary judgment in favor of Respondents. Mindful of the few remaining days before the November election, Petitioners filed a petition for extraordinary relief with this court. They accompanied that application with a notice of direct appeal from the district court's order and requested expedited disposition.

## STANDARD OF REVIEW

¶ 7 We elect to consider this matter as an expedited appeal from the district court's grant of summary judgment. *See* Utah R.App. P. 31. When reviewing a district court's grant of summary judgment, this court affords no deference to the lower court's legal conclusions and reviews them for correctness. *E.g., Schaerrer v. Stewart's Plaza Pharm., Inc.,* 2003 UT 43, ¶ 14, 79 P.3d 922.

## ANALYSIS

¶ 8 Individuals seeking to challenge a law through the referendum process must negotiate a thicket of statutory requirements, among them the mandate contained in Utah Code section 20A–7–601(3)(a) (Supp.2006). That statute provides, "Sponsors of any referendum petition ... [have] 45 days after the passage of the local law" in which to file their referendum petition. *Id.*

¶ 9 Petitioners contend that the first of these forty-five days commenced after the city posted the ordinance. Petitioners thus essentially ask us to construe the statutory term "passage" as an event marked by the last ministerial formality that must be bestowed on a legislative act. This interpreta-

tion is contrary to the commonly understood meaning of passage as the event at which a legislative body conducts a vote favorable to a piece of proposed legislation. Even if we were to include within our definition of passage action by the executive branch of government, not relevant here, that might be necessary before legislation can take effect, we conclude that the plain meaning of passage contemplates events that do not include ministerial matters. Passage connotes an act of collective assent and excludes the acts of those whose assent is not required. Because we find the language of section 20A–7–601(3)(a) to be clear and unambiguous, "our duty is to give effect to that plain meaning." *State ex rel. Z.C.,* 2007 UT 54, ¶ 11, 165 P.3d 1206.

¶ 10 Although we have never explicitly defined the word "passage," our case law impliedly supports this interpretation. *See, e.g., Tobias v. S. Jordan City Recorder,* 972 P.2d 373, 375 (Utah 1998) ("[P]etitioners did file ... within thirty-five days after the passage of ordinance 97–20," as required under an older, similar version of the statute.); *Bigler v. Vernon,* 858 P.2d 1390, 1391 (Utah 1993) ("[T]he Payson City Council passed city ordinance 02–21–90A.... [P]laintiffs and others filed an application for copies of a referendum petition form as the first step in the process of requesting that the ordinance be referred to the Payson City voters for their approval or rejection."); *Riverton Citizens for Constitutional Gov't v. Beckstead,* 631 P.2d 885, 886 (Utah 1981) ("[T]he Riverton City Council ... passed an ordinance establishing the city manager form of government," and "opponents of that measure ... submitted referendum petitions to the office of the Riverton City Recorder, seeking to refer that ordinance to the voters."). Petitioners' preferred definition of passage unacceptably distorts the common and clear understanding of the term, and we decline to adopt it.

¶ 11 Because the annexation ordinance completed the deliberative process required of the Providence City Council on October 24, this was the date of the ordinance's passage. Petitioners have not indicated nor have we discovered any evidence that the

city council somehow failed to comply with or circumvented any of these requirements. Thus, we hold that passage occurred when three of the five members of the city council voted for the annexation ordinance and not when the law was posted or signed on November 15. Accordingly, we conclude that the events of the October 24 meeting triggered the forty-five-day timeline contained in section 20A–7–601(3)(a).

¶ 12 The force of sound public policy buttresses our interpretation and application of passage. The referendum process permits the people to exercise the power of direct democracy to overturn the actions of their elected representatives. Although this conflict is not necessarily undesirable—indeed, the referendum process enjoys constitutional protection under article VI, section 1 of the Utah Constitution—the imposition of statutory controls is necessary to insulate the institutions of representative democracy from undue disruption. To this end, it is understandable that the legislature has established a timeline for submitting a referendum that is short and predictable. Government must be able to move forward with the enforcement of its laws without concern that the voters could reject such laws at any time in the future. Government cannot properly function if it is expected to suspend its operations and wait for referendums to appear.

¶ 13 Certainly, we can imagine circumstances that might justify suspending the deadline imposed by section 20A–7–601(3)(a). Due process would likely dictate that the referendum timeline be tolled if, for instance, the content of a law or the fact of its passage were not revealed until after the statutory period had run. Thus, while passage starts the referendum clock irrespective of ministerial miscues, a ministerial lapse in providing notice may result in tolling the statutory referendum period. Petitioners contend that tolling is warranted here. They insist that persons who opposed the ordinance but did not attend the October 24 meeting could not have learned of the ordinance until its formal posting on November 16, which left them an unreasonably short time to perfect the referendum. They might be right. The correctness of their position depends, however, on

proof, and Petitioners did not present any proof to the district court. Instead, they chose to ground their due process claim in the assumption that the span of time between November 16 and December 8 was presumptively so truncated that it violated Petitioners' right to due process of law. We disagree.

¶ 14 Due process is a flexible concept. Its mandates vary depending on the circumstances. In the context of participation in governmental affairs, due process guarantees voters the right to be notified of changes and developments in the laws of their community. *See Citizen's Awareness Now v. Marakis*, 873 P.2d 1117, 1123 (Utah 1994). "[V]oters must be given adequate notice ... so that they may institute referendum procedures promptly." *Id.* Petitioners contend that Providence City provided inadequate notice of the ordinance and that due process considerations require that the referendum period be extended to cure this shortcoming.

¶ 15 We took up similar challenges to a proposed referendum in two cases brought against the City of Monticello by Robert Low and others in *Low v. City of Monticello*, 2002 UT 90, 54 P.3d 1153, and *Low v. City of Monticello*, 2004 UT 90, 103 P.3d 130. We will respectively refer to these cases as *Low I* and *Low II*. When Monticello sold its electrical power distribution system to a private entity in 1979, the municipality retained a repurchase option. Monticello finally exercised this option in 2000, twenty-one years after the sale, and voters attempted to submit the repurchase option to a referendum. Monticello argued that the appropriate time to seek a referendum on the repurchase option was in 1979 when it was created by ordinance and not in 2000 when the city tried to exercise it. Although we agreed with the city in *Low I* that 1979 was the appropriate time for initiating a referendum, we found that the contemporary record before us was insufficient for us to determine whether Monticello had actually provided adequate notice of the retained option. We remanded the case to the district court for further proceedings.

¶ 16 The holding of *Low I* thus necessarily called on us to consider as the sole issue in *Low II* whether Monticello had adequately notified its residents of the repurchase option such that they had an opportunity to institute a referendum. As we explained in *Low II*, "The extent of notice required ... is merely 'adequate notice,' which provides an important, but relatively low, threshold to satisfy. Adequate notice is ... 'notice reasonably calculated to apprise a person of an action, proceeding, or motion. Notice sufficient to permit an objection or defense.'" 2004 UT 90, ¶ 15, 103 P.3d 130 (quoting *Black's Law Dictionary* 37 (5th ed.1979)). In *Low II*, we concluded that Monticello's publication of the ordinance had "provided City residents with enough information to allow them to object and initiate a referendum if they so desired." *Id.* ¶ 19.

¶ 17 In this case, we face two questions relating to the adequacy of the notice of Providence City's annexation ordinance: Did the city council impart adequate notice of the annexation ordinance at its October 24 meeting? And if the city council did not, was the notice it provided through the November 16 posting adequate to permit Petitioners to complete their petition drive before the December 8 deadline? The answers to both of these questions can only be discovered in facts and circumstances surrounding the relevant events. As we noted above, facts and circumstances might be so apparent from the record that a deprivation of due process based on inadequate notice could be presumed—for example, an ordinance passed at a sparsely attended city council meeting coupled with the posting of "official" notice on or after the forty-five-day referendum period had elapsed would presumptively violate due process. The record in this case gives us no reason to presume that notice was inadequate. More to the point, Petitioners can direct us to no facts in the record from which we could conclude either that the October 24 meeting did not impart adequate notice or that the twenty-one-day span between the November 16 posting and the December 8 deadline was inadequate.

¶ 18 Notions of fundamental fairness justify our insistence that the concept of due

process be flexible. However, facts are the levers that cause due process to bend. No facts bearing on the inability of Petitioners to comply with the statutory referendum requirements appear in the record before us. Because such facts do not appear and because the sequence of events that does appear in the record does not suggest the presence of a presumptive due process violation, we affirm the order of the district court.

¶ 19 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.